# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SUNRISE VILLAS, LLC, )<br>MATTY WERCBERGER, & )<br>SHIMON WEINBERGER )<br>)<br>Defendants. ) | Case No. 2:25-cv-2217-JPM-cgc |

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR TEMPORARY RETRAINING ORDER, APPOINTMENT OF RECEIVER, AND PRELIMINARY INJUNCTIVE RELIEF

Before the Court is a Motion for Temporary Retraining Order, Appointment of Receiver, and Preliminary Injunctive Relief, filed by Plaintiff Federal National Mortgage Association ("Plaintiff" or "Fannie Mae") on May 29, 2025. (ECF No. 32.) For the reasons set forth below, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

On February 26, 2025, Plaintiff filed its lawsuit against Defendants Sunrise Villas, LLC ("Sunrise" or "Borrower"), Matty Wercberger ("Wercberger"), and Shimon Weinberger ("Weinberger") (collectively, "Defendants"). (ECF No. 1.) On May 29, 2025, Plaintiff filed an Amended Complaint—the operative complaint in the case. (ECF No. 31.) Plaintiff asserts separate causes of action for breach of contract against Borrower and Wercberger & Weinberger (collectively, "Guarantors"). (Id. ¶¶ 97–108.)

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. (Id. ¶ 6.)

A.   **The Parties and Execution of the Loan Documents**

Borrower is a Tennessee limited liability company with Guarantors as its two members. (Id. ¶ 8.) Borrower owns and operates the Sunrise Terrace Apartments complex, located at 2080 Winchester Road, Memphis, Tennessee 38116 (the "Property"). (Id. ¶ 3.)

On October 26, 2022, Borrower obtained a loan from Arbor Commercial Funding I, LLC ("Original Lender" or "Servicer") pursuant to a Multifamily Note ("Note") in the original principal sum of $7,274,000 (the "Loan"). (Id. ¶ 13.) In connection with this transaction, Borrower executed a "Multifamily Loan and Security Agreement (Non-Recourse)" (the "Loan Agreement"). (Id. ¶ 14.) As security, Borrower granted Original Lender a "first priority security interest in, among other things and without limitation, the real property, all buildings, structures, improvements, and alterations constructed or at any time in the future constructed or placed upon the Property, together with all rents, revenues, and income thereof as well as all personal property including equipment, inventory, and general intangibles used in connection with the ownership, management, or operation of the Property" (the "Mortgaged Property"). (Id. ¶ 15.) A Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing from Borrower for the benefit of Original Lender was recorded in the Shelby County Register's Office as Instrument No. 22119290 (the "Security Instrument"). (Id.)

The same day, Guarantors executed a Guaranty of Non-Recourse Obligations (the "Guaranty"), where they "absolutely, unconditionally, and irrevocably guarantee[d] to [Plaintiff] the full and prompt payment and performance when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of all amounts,

2

obligations and liabilities owed to [Plaintiff] under Article 3 (Personal Liability) of the Loan Agreement." (Id. ¶ 16 (citing ECF No. 31-4 ¶ 3).) Original Lender then assigned the Note, Security Instrument, and all other documents referring to, relating to, or evidencing the Loan ("Loan Documents") to Plaintiff pursuant to an Assignment of Collateral Agreements and other Loan Documents ("Note Assignment") an Assignment of Security Instrument ("Mortgage Assignment"). (Id. ¶ 17.) The Note Assignment and Mortgage Assignment were recorded as Instrument No. 22119291. (Id.)

As a result of the Note Assignment and Mortgage Assignment, Plaintiff is the holder and owner of the Loan Documents and thus entitled to enforce them. (Id.)

### B.    Plaintiff's Attempts to Inspect the Property

In May 2024, Original Lender notified Borrower that Original Lender would conduct an inspection of the interior of at least six units and the exterior and common areas of the Mortgaged Property on June 25, 2024. (Id. ¶ 32.) At that time, Original Lender requested Borrower complete a Management Assessment Questionnaire and provide current rent rolls prior to the June 25 inspection. (Id.) Borrower completed the Management Assessment Questionnaire and provided its July 2024 rent roll. (Id.)

On June 25, 2024, Original Lender and Plaintiff conducted the inspection. (Id. ¶ 33.) They found "substantial issues in the physical condition of the Mortgaged Property" which "require[d] immediate attention," and "substantial deferred maintenance affecting several areas of the Property." (Id. ¶ 34.) These issues included "Life Safety issues"—"dangerous conditions that could directly threaten the safety of a buildings' occupants." (Id. ¶ 34 n.1.)

Plaintiff and Original Lender also found "misrepresentations in the Management Assessment Questionnaire and [the] July 2024 rent roll." (Id. ¶ 35.) While Borrower

3

represented to Plaintiff and Original Lender there were "no down units," they found at the inspection that "at least one unit was observed to be demolished down to the studs, and several other units appeared to need extensive renovations to restore the units to rent[-]ready condition." (Id.) Plaintiff and Original Lender also found tarp coverings on two of the buildings, "indicating water intrusion issues, but no roof leaks were reported on the Management Assessment Questionnaire." (Id.)

Because of the June 2024 inspection, Plaintiff requested a property condition assessment ("PCA") inspection be conducted on the Mortgaged Property in July 2024. (Id. ¶ 36.) However, the July 2024 PCA inspection did not occur. (Id. ¶ 37.) On October 17, 2024, Plaintiff sent Defendants a Notice of Demand stating Borrower's failure to allow a PCA inspection constitutes default under the Loan Agreement. (See ECF No. 32-1 at PageID 1066.) While Borrower appeared to agree to a PCA inspection to take place on November 13 and 14, 2024, once again no such inspection occurred. (Id.) Rather, on November 13, 2024, Borrower's counsel canceled the PCA inspection, citing "the need for a 'clear understanding of the inspection, scope and time to make necessary tenant arrangements.'" (ECF No. 1 ¶ 42 (citing ECF No. 31-11).) On November 20, 2024, Plaintiff sent Defendants a Final Notice demanding Borrower allow Plaintiff to complete the PCA inspection in December 2024. (ECF No. 32-1 at PageID 1067.) Borrower failed to comply. (Id.)

    C.    **Preliminary Injunction, PCA Inspection, and Default**

On March 7, 2025, Plaintiff filed an Emergency Motion for Temporary Restraining Order ("TRO") and Preliminary Injunctive Relief, seeking access to the Mortgaged Property to conduct a PCA inspection. (ECF Nos. 13, 14.) On March 13, 2025, Borrower's counsel

provided a Rent Roll Analysis from March 1, 2025, which stated the Property had seven vacant and no down units.  (ECF No. 31 ¶ 50; ECF No. 32-1 at PageID 1067.)

On March 17, 2025, the Court issued its Order Granting Preliminary Injunction as to Inspection.  (ECF No. 24.)  On March 27, 2025, Plaintiff conducted a PCA inspection on the Mortgaged Property.  (ECF No. 31 ¶ 51.)  The PCA identified "numerous deficiencies in the physical condition of the Mortgaged Property."  (Id. ¶ 52.)  This included Life Safety items which needed repair, three vacant units, and twenty-nine down units.  (Id. ¶¶ 52, 53.)

On April 10, 2025, Plaintiff sent a Notice of Demand to Borrowers, stating Borrowers (1) were required to deposit $1,418,730.15[1] with Servicer as additional security for the Loan within ten days of the Notice of Demand; and (2) needed to correct the deficiencies found in the PCA inspection.  (Id. ¶¶ 54, 55.)  Borrowers failed to make the $1,418,730.15 deposit.  (Id. ¶ 57.)

On April 29, 2025, Plaintiff sent a Notice of Default and Acceleration to counsel for Borrower and Guarantors ("Notice of Acceleration").  (Id. ¶ 59)  Through the Notice of Acceleration, Plaintiff "notified Borrower of the Events of Default, accelerated the Indebtedness due and owing under the Loan Documents, terminated the right of Borrower to collect Rents, and demanded that Borrower hold any Rents received by Borrower after the occurrence of the Event of Default in trust for the benefit of [Plaintiff]."  (Id. ¶ 60.)

To date, Borrower has failed to cure the Events of Default or satisfy its obligations under the Loan Documents.  (Id.)

---

[1] Plaintiff states this number arises because "$26,419.85 is currently being held by the Servicer in repair escrow and was credited to the $1,445,150.00 in Additional Lender Repairs and Additional Lender Replacements identified in the PCA."  (ECF No. 32-1 at PageID 1068 n.3.)

5

II.     DISCUSSION

Plaintiff moves the Court to (1) appoint a receiver; (2) issue a TRO; and (3) issue preliminary injunctive relief.  (ECF No. 32 at PageID 1058.)  The Court addresses each in turn.

   A.     Receiver

           *i.      Legal Standard*

"Rule 66 of the Federal Rules of Civil Procedure authorizes the appointment of a receiver if a person with an interest in the property provides sufficient justification."  PNC Bank, Nat. Ass'n v. Goyette Mech. Co., 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014) (citing Santibanez v. Wier McMahon & Co., 105 F.3d 234, 241 (5th Cir. 1997)).[2]

"A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court. The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." Liberte Cap. Grp., LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006).

The Court considers the following factors when determining whether to appoint a receiver:

> (1) the adequacy of the security; (2) the financial position of the borrower; (3) any fraudulent conduct on the defendant's part; (4) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (5) inadequacy of legal remedies; (6) the probability that harm to the plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (7) the plaintiff's probable success in the action and the possibility of irreparable injury

---

[2] The Court analyzes whether to appoint a receiver under the Federal Rules of Civil Procedure because "[a]lthough the Sixth Circuit itself has not addressed the issue, the weight of authority suggests that appointment of a receiver in a diversity action is controlled by federal law, not state law." Fed. Nat. Mortg. Ass'n v. Mapletree Invs. Ltd. P'ship, No. 10-cv-10381, 2010 WL 1753112, at *2 (E.D. Mich. Apr. 30, 2010) (collecting cases).

to the plaintiff's interest in the property; and (8) whether the plaintiff's interests sought to be protected will in fact be well-served by a receivership.

PNC Bank, 15 F. Supp. 3d at 758. "Moreover, the [P]arties' advance consent to the appointment of a receive is a strong factor weighing in favor of appointing one." See id.

### ii.  Analysis

The Court finds it appropriate to appoint a receiver, as both Borrower's consent and the PNC Bank factors weigh in favor of appointing a receiver. See 15 F. Supp. 3d at 758.

In the Security Instrument, Borrower "expressly consent[ed] to the appointment of [a] receiver, including the appointment of a receiver ex parte," after an Event of Default. (ECF No. 31-3 at PageID 560.) Borrower's consent is "a strong factor weighing in . . . [P]laintiff's favor." See Mapletree, 2010 WL 1753112, at *2; see also New York Life Ins. Co. v. Watt W. Inv. Corp., 755 F. Supp. 287, 292 (E.D. Cal. 1991) ("surely the fact that the parties agreed to the appointment of a receiver in the deed of trust is entitled to great weight as the court exercises its discretion"). And while the "circumstances justifying the issuance of an ex parte order are extremely limited," Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006) (citing Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 438–39 (1974)), Borrower expressly consented to appointment of a receiver ex parte. Thus, Borrower's consent is a strong factor in favor of appointing a receiver ex parte.

Furthermore, the PNC Bank factors weigh in favor of appointing a receiver. See 15 F. Supp. 3d at 758. First, Borrower has failed to maintain the Mortgaged Property and pay its debts. (ECF No. 31-15 at PageID 704–05; ECF No. 31-17 at PageID 1056.) The PCA Inspection indicated twenty-nine down units and multiple Life Safety issues. (ECF No. 31-15 at PageID 704–05.) This indicates "the two most important factors-adequacy of the security and financial condition of the borrower[—]both weigh in favor of appointing a receiver." See

Mapletree, 2010 WL 1753112, at *4–5 (finding these two factors weighed in favor of appointing a receiver where a property inspection found substantial damage to the property and the defendant could not pay its monthly installments).

Second, Plaintiff will be further harmed if the Court does not appoint a receiver. There is a danger the Mortgaged Property will continue to fall into disrepair. The PCA Inspection indicated the Mortgaged Property is "in declining condition," finding mold in down units, leaking sewage, and illegible spray-painted building numbers. (ECF No. 31-15 at PageID 707, 712.) Indeed, Plaintiff states its "only chance at recovering the loan amount is by selling the Property in foreclosure." (ECF No. 32-1 at PageID 1074 (quoting Mapletree, 2010 WL 1753112, at *5).) Accordingly, Plaintiff will be irreparably injured without the appointment of a receiver over the Mortgaged Property. See Mapletree, 2010 WL 1753112, at *5. Additionally, Borrower expressly agreed to appointment of a receiver. (ECF No. 31-3 at PageID 560.) Thus, Plaintiff's harm outweighs Defendants' harm where the Court appoints a receiver. See Mapletree, 2010 WL 1753112, at *5. Accordingly, factors four, five, six, and seven weigh in favor of appointing a receiver. See id.

Third, Plaintiff's interests in the Mortgaged Property will be well-served by a receivership, "as the appointment will allow [Plaintiff] to receive income from the [Mortgaged Property] during the pendency of the foreclosure proceedings to reduce their loss, and enable [Plaintiff] to apply these funds toward continued maintenance of the [Mortgaged Property]." Citizens Bank v. Cedar Fairmount Realty, Ltd., No. 1:11-cv-1492, 2011 WL 13228872, at *8 (N.D. Ohio Dec. 9, 2011); (ECF No. 32-1 at PageID 1076.)

    *iii.*    *Conclusion*

Because both Borrower's consent and the balance of the PNC Bank factors weigh in favor of appointing a receiver, the Court appoints M. Shapiro Real Estate Group ("Shapiro") as receiver for the Property. (See ECF No. 32-1 at PageID 1077.) Shapiro has experience in multifamily real estate management, including significant experience as a court-appointed receiver. (Id.); M. Shapiro Real Est. Grp., Receivership, https://www.mshapirorealestate.com/business-services (last visited June 16, 2025).

**B.**    **TRO**

    *i.*    *Legal Standard*

The Court may issue a TRO without written or oral notice to the adverse parties or their attorney, but only upon two necessary conditions: (1) if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." See Fed. R. Civ. P. 65(b)(1).

    *ii.*    *Analysis*

Plaintiff moves the Court for a TRO to restrain Defendants and their officers, agents, or any others acting on their behalf from (1) transferring, selling, converting, assigning, or disposing of any Mortgaged Property; and (2) removing, altering, and destroying any books, accounts, or records relating to the Mortgaged Property. (ECF No. 32 at PageID 1059.)

Plaintiff's attorney, however, did not "certif[y] in writing any efforts made to give notice and the reasons why [notice] should not be required." Fed. R. Civ. P. 65(b)(1)(B); (cf. ECF Nos. 32, 32-1.) Plaintiff merely states that there is a threat of irreparable harm given the

Mortgaged Property is the "only source of recovery" and the Mortgaged Property's "deteriorating condition [which] requires immediate repairs." (ECF No. 32-1 at PageID 1079–80; see ECF No. 31 ¶¶ 81–85.) The Court finds this unavailing. Defendants have appeared in the case and are represented by counsel. (See ECF Nos. 19, 20 (Notices of Appearance of counsel on behalf of Defendants).) The Parties have worked together previously to file a consent order granting a preliminary injunction as to inspection of the Mortgaged Property. (See ECF No. 23.) Given the Parties have a method to contact each other, Plaintiff has given no indication as to why it could not give notice to Defendants.

Furthermore, moving for a TRO, without demonstrating why notice should not be required, runs counter to the policy that "circumstances justifying the issuance of an ex parte order are extremely limited." Reno Air, 452 F.3d at 1131 (citing Granny Goose, 415 U.S. at 438–39). Indeed, "[t]he stringent restrictions . . . on the availability of ex parte [TROs] reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." Granny Goose, 415 U.S. at 438–39.

### iii. Conclusion

Because Plaintiff is required to certify as to why notice should not be required, but did not do so, Plaintiff's Motion for TRO is **DENIED**. See Fed. R. Civ. P. 65(b)(1)(B).

### C. Preliminary Injunction

"The [C]ourt may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Because Defendants have had no notice as to Plaintiff's Motion, the Court cannot enter a preliminary injunction. See id. Accordingly, Plaintiff's Motion for Preliminary Injunction is **DENIED**.

### III. CONCLUSION

For the above reasons, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**.  The Court appoints Shapiro as receiver.  The Court does not issue a TRO or preliminary injunction.

**SO ORDERED**, this the 20th day of June, 2025.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE